IN RE APPROPRIATION OF EASEMENT FOR HIGHWAY PURPOSES: THORMYER, ACTING DIR., APPELLANT, *v.* RAUCH ET AL., APPELLEES.*

---

*Appeal dismissed, 169 Ohio St., 314.

(No. 2460—Decided June 21, 1958.)

*Mr. William Saxbe,* attorney general, and *Mr. I. Charles Rhoads,* for appellant.

*Mr. Mason Douglass* and *Mr. Floyd F. Koogler,* for appellees.

HORNBECK, P. J. This is an appeal from a judgment entered on a verdict wherein the jury fixed the compensation of appellees for the land taken by appropriation for highway purposes—"exclusive of structure situated wholly upon the land appropriated, $27,890; damage to residue, $1,710 and value of structure, $100, total of $29,700."

The resolution and finding of the Director of Highways describes five parcels of land and interests therein to be taken. Parcel No. 20-LA (highway), perpetual easement for limited

access highway purposes, containing 2.575 acres, more or less; parcel No. 20-A-SL (slope), the temporary right to construct a slope in accordance with the plans and for no other purpose, containing 0.204 of an acre, more or less; parcel No. 20-B-SL (slope), the temporary right to construct a slope in accordance with the plans and for no other purpose, containing 0.327 of an acre, more or less; parcel No. 23-B (highway), perpetual easement for highway purposes, containing 0.590 of an acre, more or less; and parcel No. 23 ALA (highway), perpetual easement for limited access highway purposes, containing 5.553 acres, more or less. The director fixed the value of the land at $4,986.60; value of structure, $100; damages to residue, $350, and made a total deposit of $5,436.60.

Seven errors are assigned, the first three of which we consider together. They are:

1. The trial court erred in admitting valuation testimony predicated upon the product of the estimated amount of a gravel deposit and a fixed price per unit.

2. The trial court erred in permitting opinion testimony on value of property other than the property taken by appropriation herein.

3. The trial court erred in admitting valuation testimony to go to the jury based on business profits.

The testimony to which the assignments refer is, first, that of William H. Miller who testified on cross-examination as follows:

"Q. Tell if it isn't a fact that you arrived at your valuation per acre based on a computation of approximately 48,000 cubic yards per acre at a sales price which you received at fifteen cents per cubic yard? A. That's right."

Earl D. Creager, on direct examination, testified as follows:

"Q. In reaching your conclusion as to what that property is worth as a gravel area, what relation would that cubic yards have to your conclusion? A. Of course I am paying—

"Q. Don't give the figure. You took the cubic yards and applied a paying figure for it, is that right? A. That's right."

Robert L. Snyder, after expressing an opinion on the "fair market value of gravel," on cross-examination testified as follows:

"Q. But you approach value by taking—by cubing the gravel in a particular area and multiplying it by some figure? A. That's right."

The witness was permitted to state how he would value 30 feet of gravel per acre, and to answer the following question:

"Q. I want to ask you then, what would you consider the fair market value of gravel of excellent quality, 30 feet deep, in that location, per acre?"

And the further testimony of William H. Miller:

"A. I paid Mr. Rauch ten cents per yard and sold for fifteen cents and I didn't touch it. I invested ten thousand and sold out for fifteen thousand, and made five thousand clear money, and I didn't do anything to it."

This testimony was directed to the valuation of the 5.53-acre tract. Rauch said there were four acres of gravel land in this tract. It appeared that part of the land adjacent to this tract had been prior to and at the time of the taking an operating gravel pit. The witness Miller had testified, at length, wherein it appeared that he was widely experienced in the operation of removing gravel from the ground, transporting, using and dealing in it. He was familiar with the land to be taken and the probable extent to which it was underlaid with gravel. He said that he had dug either five or six test holes "in as deep as our big hoe would dig, which is a maximum of eighteen feet."

The director insists that but one test hole was dug in the land taken but it is clear that the other holes were in the vicinity of the land taken. The witness Miller also said that another person had:

"* * * dug out fourteen feet, and we went in the bottom of the excavation that Hubert Lane had made and took our big hoe in order to determine how much gravel was there. * * * and we dug eighteen feet so we felt that certain, it was before our own eyes, we could lay it out on the bank and say that Mr. Rauch had thirty feet of good gravel before we touched water.

"* * *

"* * * There was three holes dug in the area that Hubert Lane had excavated, which it bears out was just about to the center of Route 40."

The witness Miller testified further:

"Q. And how does the gravel in that pit that is now operating compare with the gravel in the pit that is now part of the highway? A. It is the same general run all through there."

The witness had said that the gravel he found was excellent quality bank run gravel. This question was then put:

"Q. * * * Now, based on your knowledge of the quality of the gravel, its accessibility, and fact that it was above water level, are you in a position to express an opinion as to the value per acre of that gravel-bearing land? A. About $7,200."

Counsel for the land owners would not permit the witness to state how he arrived at the valuation fixed but upon insistence of counsel for the director he was permitted to answer and stated:

"When I buy gravel land I figure it for 43,560 square feet in that acre. I go out and dig down with a shovel to make sure that gravel is actually there. And if it is thirty feet deep I multiply 30 by 43,560 and divide by 27, and get my cubic yards. And I know that in each acre of ground Mr. Rauch had there was about 48,000 cubic yards of gravel, and I sold 40,000 of it in one year at fifteen cents a yard. Those are facts now."

On motion of the director this answer as to value was stricken, but that part of the testimony as to the tests and observations made to determine the presence and amount of gravel in the tract and the quality thereof remained. Then the witness was asked:

"Q. Based on your knowledge of this gravel-bearing land of Mr. Rauch, on your experience in the gravel business through the years, your experience and knowledge of the market, and the location of this gravel, I ask you are you in position to express an opinion of the value of that land as it lays there? A. I am.

"Q. Of that gravel-bearing land as you see it laying there. And then that is your opinion as to the value of that gravel-bearing land per acre? A. $7,200."

A motion to strike the answer was overruled.

On cross-examination it developed that the witness arrived at the value which he fixed because he had advanced $10,000 to

Rauch as royalty for gravel to be taken on February 20, 1956; "that he sold it for $15,000 without doing anything to the gravel; that he had been approached by three different gravel men to buy." He said that he did not do anything to it—meaning the gravel that he had agreed to purchase from Mr. Rauch. From his answers, it is inferable that the purchase and sale he made was for the gravel and the top soil as a constituent part of the land adjacent to the tract taken by the director, and that no estimate was made upon the basis of the gravel actually removed from the land nor the cost incident to such removal. The profit which the witness Miller received on his purchase was illustrative only of the market value of the gravel land before any separation of the gravel from the earth.

If from the cited cross-examination of Miller and the other experts who testified for the land owners it appeared that their answers-in-chief were based on improper and incompetent grounds, it should have been stricken. 18 American Jurisprudence, 1001, Eminent Domain, Section 355.

It is obvious that the witness Miller relied upon his knowledge that the gravel which he was appraising and the land taken was of the same quality and that the conditions were the same as those which attended when he sold his own gravel in the ground. He fixed the extent of the gravel deposit in the land taken from his tests and acquaintance with the land and used only the value of the gravel which he had sold as a basis for fixing the value of the gravel *in situ* in the land taken in the appropriation proceedings.

It is our opinion that the testimony of Miller and the other experts for the land owners to which objection was interposed does not bear the infirmity which is pointed out in appellant's brief in the quotation from 4 Nichols On Eminent Domain (3 Ed.), 248, Section 13.22 [2], 1 Orgel on Valuation Under Eminent Domain (2 Ed.), 671, Section 165, and Jahr's Eminent Domain, Valuation and Procedure, 233, Section 151. The testimony was not predicated upon retail value of the gravel or upon profits that might accrue by the sale of the gravel when taken from the earth but its value as a constituent part of the land. We are committed to approval of this type of

testimony, in our opinion in *In re Appropriation of Easement for Highway Purposes over Property of Moores Lime Co.*, 107 Ohio App., 58. We are satisfied that counsel for appellee carefully avoided questions which would elicit incompetent answers in fixing value of the land taken.

The scope of the obligation of the jury in fixing the value of the land taken was properly stated by the trial judge in his general charge and particularly in the following special charge No. 10, given before argument on request of the land owners:

"The court charges you that you can consider the value of the gravel deposit in place, in determining the value of the gravel-bearing land of the owners. The rule is that the value of the gravel separated from the land is not recoverable as merchandise additional to the value of the land, but that the gravel deposit in the land, and the value thereof as thus in the ground, should be considered by you insofar as it affects the market value of the land in determining the value of the land to the found by you."

The theories of the Director of Highways and the landowners as to the valuation of the land taken were different. The director contended that the highest and best practicable use of this land was for farming purposes. The landowners, on the contrary, insisted that it had a higher and more valuable use, namely, as gravel-bearing land. By reason of this difference, the valuation fixed by the experts who testified for the director and for the landowners differed radically. Manifestly, the jury accepted, in the main, but not *in toto*, the appraisals of landowners' witnesses. There is no objection to the verdict on the ground that it is excessive and the sole question is whether or not the evidence by which the amount thereof was reached should have been stricken.

The first few paragraphs of the opinion by Chief Justice Weygandt in *Tennessee Gas Transmission Co.* v. *Wolfe*, 159 Ohio St., 391, 112 N. E. (2d), 376, dispose of the validity of any objection to the testimony as to the gravel-bearing quality of the land taken, because of insufficiency of test holes on the land taken.

In that case the witness had been permitted to answer a

hypothetical question as to the value of underlying strippable coal, and said that the construction of the pipe lines to be placed in the land to be used would prevent the stripping of approximately 100,000 tons of coal that otherwise could be removed.

At page 32, the opinion states:

"The plaintiff asserts that the opinion of the witness was based on the single fact that only one hole or well had been drilled on the land involved.

"The defendants insist that the record discloses ample evidence to warrant the hypothetical question and the answer thereto. They observe that in addition to the drilling of the one hole or well, there is evidence of outcroppings of several veins of coal on the steep sides of the gullies running through the land.

"This court is of the view that the drilling of but one hole or well on the land presents a question of the weight of that evidence rather than its admissibility."

The rule of valuation in a land appropriation proceeding is not what the property is worth for any particular use but what it is worth generally, for any and all uses for which it might be suitable, including the most valuable uses to which it can reasonably and practically be adapted. Paragraph three of the syllabus of *In re Appropriation by Supt. of Public Works*, 155 Ohio St., 454, 99 N. E. (2d), 313.

If it appear, as here, that land is underlaid with gravel and the probable extent and quality thereof, the value of which, as a part of the ground taken, may be fixed by a recognized standard, it is obvious that the worth of the land is equal, at least, to the value of its content so fixed. *Cleveland Terminal & Valley Rd. Co.* v. *Gorsuch,* 8 C. C. (N. S.). 297, 18 C. D., 468, affirmed without opinion, 76 Ohio St., 609, 81 N. E., 1186.

The whole matter is resolved upon determination if the opinions as to the amount and quality of the gravel are based upon speculation or have, upon the evidence adduced, reasonable basis to support them. The evidence in this case, as presented by the landowners, was sufficiently definite to afford a basis for the jury, if believed, to fix the value of the land taken.

In *State* v. *Herman,* 188 Minn., 252, 247 N. W., 4, the writer of the opinion, commenting on evidence relative to deposit of

sand and gravel on the land involved and holding it competent, as showing that the market value was thereby enhanced, said:

"It was not held otherwise in *C., M. & St. P. R. Co.* v. *Mason,* 23 S. D., 564, 569, 122 N. W. 601. There an offer to prove the cubical contents of a gravel deposit in nearly 35 acres of land had been rejected. The thing offered was an estimate, and it was held 'speculation only * * * no true or reasonable rule as to the value of the land.' But that does not go to the point of holding that evidence is incompetent which shows not only the presence of a valuable deposit and that it has a unit value, but also what that value is and the quantity to which the value is to be applied. The presence of the deposit alone is relevant, as is also its quality and the market value and demand, if any. There can be no competent proof of quantity without ascertainment of extent and boundaries sufficient to enable someone to make an estimate of cubical contents with a reasonable degree of accuracy."

The *Mason case,* cited in the opinion, is meager in the statement of facts, but it is clear that the proffer of proof of the number of cubic yards of sand and gravel in the land affected was but an esimate which was speculative only.

It is held in *Muccino* v. *Baltimore & Ohio Rd. Co.,* 33 Ohio App., 102, 168 N. E., 752, that the competency of the sale price of land other than land appropriated, depends on the proximity of sale and other circumstances determinable by the trial judge.

The court in *Muskingum Watershed Conservancy District* v. *Funk,* 134 Ohio St., 302, 16 N. E. (2d), 454, recognizes the rule as to the amount of compensation allowable, as we have heretofore stated it. It refused to disapprove this charge:

"Now there has been some evidence in this case in regard to value on sand, probably both as lying under the ground as well as after it has been removed. The court wishes to caution the jury that evidence is presented in order to help you arrive at the ultimate question which you must finally determine, and that is the value of this property which the plaintiff is taking. In no event after you have arrived at a valuation as the court has indicated, could you add an additional amount by reason

of sand and gravel to be removed. If that is of value to you in determining the value of the land, it is to be included within that determination. In other words, that is one of the elements as a building, or had there been an orchard on the farm, it tends to go to show the value of the property itself."

Although *Seither* v. *City of Cleveland,* 17 C. C. (N. S.), 552, 32 C. D., 288, is not parallel with respect to the interest affected by the taking by the city, some comments of the court in the opinion, at page 558, are applicable.

"'* * * As well said in a number of the cases, it is difficult to frame a rule which shall be applicable in all cases, but it seems an anomalous thing that if property is specially suitable for a particular use that fact may not be shown when the value of such property is to be ascertained. This would certainly be true if it was a case of bargain and sale of property * * *.

"*Every* use for which the land is suitable should be taken into account in determining its value, and taking into account such uses, including the use for which the appropriation is made, the jury should say what the fair value of the land is, and this does not require of the jury nor must not permit the jury to put a speculative or an exorbitant price upon the land, but to determine and allow what, all things being taken into account, the land is fairly worth."

In the light of the facts developed in chief, the court did not err in refusing to strike the opinion testimony of the experts as to the value of the gravel land in the tract taken in the appropriation proceeding.

The fourth error assigned is: "The trial court erred in permitting redirect (or resuming direct) examination of a witness in the absence of cross-examination." The ruling which is challenged by this assignment was entirely within the discretion of the trial judge.

The fifth assignment is: "Misconduct of the trial court."

We have carefully read this record. Considerable repartee was engaged in between counsel during the trial which required rulings from the trial judge. At times, the examination of witnesses on cross-examination on the part of counsel for the director was somewhat afield. The trial judge was attempting

to expedite the trial of the cause. In the rulings which he made in these situations, we cannot find that any of them even approached misconduct on his part or could have resulted in prejudice to appellant's cause.

The sixth assignment is: "Failing to swear the jury before *voir dire* examination."

Attention is directed to Section 2313.42, Revised Code:

"Any person called as a juror for the trial of any cause shall be examined under oath or upon affirmation as to his qualifications."

Following this quoted portion of the statute are set out ten grounds for challenge of a juror for cause.

This statute became effective on the 9th day of September 1957. The trial of the cause began on the 17th of September 1957. Although ignorance of the law excuses no one, it is probable that many judges and trial lawyers, at the time of this trial, were not familiar with the terms of the statute. If counsel knew of the statute, which we must assume, they waived its provisions. An examination of the record shows that the members of the panel were examined separately and collectively to an extent covering 26 pages of the record. The trial judge, with the assent of counsel, excused six of the panel, the landowners excused one for cause and each party exercised one peremptory challenge. No request was made to swear the panel on *voir dire,* no exception taken for failure to do so and no exception noted to the manner of the selection of the jury. There is not the slightest suggestion of prejudice resulting to appellant by the failure to swear the panel on *voir dire.* So that, if we hold this assignment of error to be well made, it must be done solely upon the letter of the statute. We are not ready to make such a drastic holding, in view of the fact that it is clear that no prejudice resulted to appellant by the procedure followed in the selection of the jury.

The seventh assignment of error is: "The court erred in using its power to supply a substantial omission or to correct a defect in substance in the verdict."

The question arose by reason of the following developments: The jury indicated that it had reached a verdict. It

was brought into court at 7 p. m.; the clerk was instructed to and did read the verdict; the judge accepted the verdict, thanked the jury and excused them. At 7:30 p. m. the court reconvened the jury, having in the meantime discovered that eight jurors only had signed the verdict as originally accepted. Each member of the panel was then interrogated separately to determine whether the verdict was his verdict. Upon this examination it developed that juror No. 1 concurred in the verdict but had not signed it. Thereupon, the judge instructed this juror to sign the verdict, which was done, and it was accepted in original form with the added signature.

The applicable statute is Section 2315.11, Revised Code:

"If the disagreement of more than one fourth of the jury is not expressed and neither party requires the jury to be polled, or on the polling, three fourths or more of the jury answer affirmatively, the verdict is complete and the jury shall be discharged from the case. When the verdict is defective in form only, with the assent of the jurors and before their discharge the court may correct it."

It will be noted that the jury had separated for thirty minutes only between the first and second acceptances of the verdict. The verdict as returned was defective in form in that it was not a verdict because signed by eight members only of the jury. When the jury was polled, three-fourths of its members indicated concurrence in the verdict as returned, and the defect was merely that a juror who had concurred in the verdict had not signed it. The first discharge of the jury was not authorized by the statute. The spirit of the section was observed and the verdict as finally accepted clearly conformed to the language of the section.

*Niebling* v. *Laidlaw,* 12 C. C. (N. S.), 463, 22 C. D., 371, cited by appellant is not in point. There the trial judge, after the verdict for the plaintiff had been accepted in a sum without interest, added interest upon the judgment. Clearly, the verdict, as returned was a complete and correct verdict, and the change which the trial judge made was in the substance thereof. The Circuit Court modified the judgment to conform to the verdict as originally returned. In *Boyer* v. *Maloney,* 27 Ohio App.,

52, 160 N. E., 740, the jury returned a verdict on Saturday, January 22, 1927. The verdict was complete in form and substance. The jury was discharged after the verdict had been received by the court, read by the clerk, filed by him, entered upon the trial docket and recorded on the journal. On Monday, January 24, following the Saturday when the verdict was returned, the jury was reconvened, whereupon it appeared upon inquiry that a mistake in the verdict as accepted had been made; that it was intended the verdict be returned for the plaintiff instead of for the defendant. The jury thought that it had so rendered the verdict. It was ordered to retire for further deliberation. The second verdict, at complete variance with the first, was brought in, read, accepted and judgment entered upon it. In the *Boyer case,* the defect in the verdict was in the substance thereof. In the instant case there was no change in the substance. The form was incorrect in that a juror who had actually concurred in the verdict had not formally signed his name thereto. The action of the trial judge did not offend the statute and no prejudice resulted to the appellant by the action taken.

We find no error assigned well made.

The judgment is affirmed.

*Judgment affirmed.*

CRAWFORD and YOUNGER, JJ., concur.

YOUNGER, J., of the Third Appellate District, sitting by designation in the Second Appellate District.